May it please the court, Ezekiel Cortez on behalf of Mr. Bagdasarian. Chief Justice Kuczynski, I'd like to reserve three minutes for rebuttal. You have a clock in front of you. Yes, sir. Thank you. The statements in this case that the government took and prosecuted as true threats are racist. They are frightening. They are filled with hate. No doubt about that. However, these statements were made in a public forum in the Internet, in Internet chat rooms, two separate chat rooms. These statements were made by an individual who even the government implicitly accepts may have been drunk at the time. Third, these statements were statements that were imprecise statements, a soapy and language, if you will. He will have a 50 caliber in his head soon. I'm sorry. What kind of language? A soapy and a soap fables. A soapy. Sorry for the pronunciation. I'm sure you could understand. I just didn't. Thank you. Thank you. These statements were not a precise statement, such as the one in Romo where Mr. Bagdasarian would have said in the government's world, I'm going to put a bullet through the president's head or rather the candidate's head. These statements are more as as you, Chief Justice Kuczynski noted in the Planned Parenthood case. These statements are more like a doctor telling a patient you're going to get cancer in six months and you're going to die. Why are they like that? Let me tell you why. You mean in my dissent? Yes, sir. In the Planned Parenthood case? In the brilliant dissent that was written in that case. I have learned. In which Justice Reinhart also joined and Justice Beza. I did not. You dissented of course. I was in the majority. I'm hoping to persuade you here today. Well, you're talking to him. I mean. I understand, but I'm keeping you in mind. And then all jest aside, this is what I believe these statements are identical to, that analogy that you just. Well, they're two different statements. They're two calves, and you might as well talk about them specifically. Yes, sir. The first statement, he will have a .50 cal in the head soon. The other one, shoot the N. Those are the two statements. Let's look at the first statement. He will have a .50 caliber in his head soon. Why is that analogous and almost identical to the example given by Justice Kuczynski? The problem with that statement is that the evidence shows that Mr. Beg-Desarian actually possessed a .50 caliber gun. Good point. Good point. And that's the danger here. The danger that would tempt. But doesn't that show, I mean, doesn't that go, if you're, if we're going to, I mean, I understand some people are arguing we have a split or uncertainty about whether or not the subjective intent element's required, but doesn't that go to subjective intent? I mean, if he actually possessed the weapon and he made that statement. You're absolutely right. And let me tell you why that's not a complete argument, if I may. By the same logic, by the same logic that you use, which is the government's argument, there's the .50 caliber in his possession. By the way, it was a muscle-loading .50 caliber. You couldn't hit a deer 300 yards with it. It's not the same one that the government offered for the bench trial, that picture of the almost assault rifle .50 caliber. But let me address it directly. By that same logic, what happened here was that almost 30 days after these entries in the chat rooms were made, the Secret Service came knocking at Mr. Bagdasarian's door 30 days later. In those 30 days, by that same logic, nothing happened. There was no offer to act taken. There were no preparatory actions taken to carry out the alleged threat. He is a pilot. He had possession of three different airplanes at the time. So at the same time, he had several other weapons. He had an assault rifle. But incidentally, one has the constitutional right to possess weapons in this country. But by the same logic, even after the Secret Service people showed up at his door and talked to him, and he told them, yes, I made those entries. I was drunk. I didn't mean it. Yes, I have weapons. One is right up here on the cupboard. The agent went and retrieved it, put it on top of the table. Do you have any other weapons, Mr. Bagdasarian? Of course I do. They're in the house. I have a rifle. I have others. And I have ammunition. What did the Secret Service people do? And this is relevant to whether possessing a .50 caliber weapon is evidence of intent. What did the Secret Service people do? They left for five days to get a search warrant and an arrest warrant. So for five days, even after the authorities contacted this man in possession of weapons, he did nothing that was perceived as threatening, dangerous, or anything. He does have the constitutional right, well, he did before, to possess weapons. So the mere possession of a .50 caliber muscle-loading rifle, we say, adds nothing to the equation as to whether the first statement is a threat or not. It sort of does, doesn't it? I mean, if he says he ought to be run over by a tank, you know. He didn't say that. There were other participants. If he were to say he ought to be run over by a tank, or he ought to have a nuclear weapon dropped on his house, then people would say, well, he doesn't really have a tank to run him over, and he doesn't have a nuclear bomb. He may have a plane, but he doesn't have a nuclear weapon to drop on his house. So it's more of an empty threat. But in this case, he makes specific reference to the kind of munition that he actually does have. Indeed, but at the same time... I take it more seriously. Of course, you can take it seriously for investigative purposes, as the Secret Service here did, but not for prosecution purposes. The fact that he had a .50 caliber handgun, you are then selecting individuals out of society... It was a long rifle, right? Yes, it was a muscle-loading rifle. Rifle? Rifle, yes. Muscle-loader. Rifle? Was it a shotgun, a rifle? No, it's the kind that you use in the Civil War. You fill the powder in there, you put the wadding in there, and you put the... A bow out? It's a muscle-loader. A bow out? Exactly. You're not exactly going to hit anybody at even 50 yards if you're not prepared. But the point I believe... Was it working? I'm sorry? Was it a working weapon? Yes, it was a working weapon. As you know, the ability to carry out the alleged threat is not an element of the offense. So what you're doing with this type of thought process... No, no, but the fact that he has it, and he makes a specific reference to something he has, gives concreteness to the thought. It's sort of like, I have a weapon that I really wish to use. If you make a reference to some sort of non-existent weapon, if you say, gee, I wish I had a cadaver-cadaver charm, you know, like Harry Potter, No, no, I mean, you know, he doesn't have that. You could wish you had magic, but you don't. And so people don't take it seriously if you made a reference to some fanciful weapon. But when he mentions something that he has in his closet, to me that says he's actually sort of thinking, imagining he's going to use it. But you're using that as circumstantial evidence to retroactively try to figure out his intent at the time he made the statement. That's what juries are for. Absolutely. That's what juries do. Absolutely. And what happened in this case... I mean, if we couldn't do that, you could never convict anybody of first-degree murder. Absolutely. But here, I think we know what was in his mind, because at 8 o'clock in the morning, replying to one of those people in the chatroom, he said, I was drunk. Didn't mean it. So we know what was in his mind. Yeah, but that was after other people in the chatroom were saying, this is serious and we're going to report you. In the second chatroom, the second statement. Did the other people in the chatroom know about the guns he had in his house? Absolutely not. And, again, there are two statements here. Thank you for pointing it out. The first one, which we're talking about here, the .50 caliber in the head statement, was in a chatroom where no one complained about it. No one. In fact, if you look, you have the entire colloquy there. It's in a political context. They're talking about the Middle East. They're talking about oil. They're talking about finances. And at the same time, I might add, since we're doing the circumstantial evidence issue, at the same time around the country, people were talking about weapons. People were criticizing Obama as a candidate. People were saying, shoot him, kill him. So in that time, in that context, this man – Well, I hope there weren't too many people saying that. Well, I believe there were. If you look at the documentaries that were made, especially of the rallies in Arizona, there were a lot of people. But the point being that Mr. Bagdasarian very well could have meant, and for trial purposes, very well could have meant what I've seen in society right now, what we're talking about right here. He's going to have a .50 caliber in his head soon because of all the people saying those things throughout the nation. Now, in a trial context, he had a reasonable doubt standard context. Then we have to look back to find out what the trial court had in mind. You know what the trial court had in mind because the trial court told you. Judge Huff repeatedly told you the basis of her ruling, the basis of her finding of beyond a reasonable doubt evidence. Now, with Romo, the government relies 100 percent on Romo. They put all their eggs in one basket. You know what Romo says. He has nothing to do with this case at all. In fact, in Romo, the court pointed out that he didn't have the ability, the means with which to carry out the threat. That's the flip side of a guy who has a .50 caliber, I say. So the issue here is how the trial court found guilt. The trial court told you how she found guilt. She relied entirely on Romo. Romo couldn't be more inopposite for the facts of this case. But if I may get to the second issue, which is the First Amendment vagueness issue of should be any, clearly that statement or that type of statement was discussed at length by you, Chief Justice Kuczynski, in your dissenting opinion. Well, dissents aren't generally the best way to win a case. It would be nice if you had a majority opinion to support you. The problem is that we don't have a case on point, Justice. If we had a case on point, then we could refer to it. I'm sorry? Have you heard of a case called Doe v. Kamehameha Schools? Yes, I have. Is that relevant to our case? Yes. And our position, Your Honors, is very, very simple. The reason why I refer you to the Planned Parenthood case and the Romo case is because we're dealing with statements here that are facially, logically imprecise. Shoot the person, if you will. Shoot the person. Is that a command? Is that a wish? Definitely that's vague. It would require someone to ask the person, what do you mean, shoot the whatever? Explain yourself, what do you mean? So that statement facially, facially couldn't be more vague. It praised someone. I'm sorry. In which regard do you think it's vague? Do you think it's vague as to the object? No. I mean, everybody knows that when he used the N-word, he was talking about Obama. Without a doubt. It is not vague regarding? So it's not vague in that regard. Correct. Okay. So how do you consider it to be vague? It is vague because when a person makes a statement to no one in particular, shoot the N. We know who the target person is, number one. We don't know what they mean by that. Number two, we don't know, we don't know whether he's telling people to do whatever they want to do. And there's case law right on point, as you know, to incite others to commit this type of. The other prosecution that's going on in New York about the fellow who is accused of threatening the three judges. Yes, completely different statute. And that's the point, Justice Kuczynski. We have here a case that has a very specific statute, 879. It has a specific intent requirement. Going back and forth. I mean, there's the statutory analysis and then there's the First Amendment analysis. Yes. You keep going back and forth on those two analyses. And I think we have to. Okay. Well, no, I mean, maybe you could make your argument directed to 879 and then make your argument directed to the First Amendment. Okay. Or do you think the elements are the same? I believe they are the same and they cross-pollinate. Because if you have a specific intent requirement in a jury instruction. Yes, right. In what context? But what's the intent? The intent is an intent to threaten. Precisely. It's not the intent to carry it out. Right. It's the intent to make a threat of violence. Now, here you have the statute that has a specific intent requirement. This is what this Court held. And then you have the First Amendment component, which ties into how do you analyze statements in the first place. When you're talking about political speech, which is a threshold analytical issue, if the statement is made within a political context, if the statement is made within a public political context, then you have a completely different analysis. And that's why I'm now referring to the Planned Parenthood case and how it ties perfectly together with the requirement of the statute. Our position is quite simple. In order to prosecute someone, in order to give the government the power to prosecute and single out an individual from a crowd in a candidacy for a president that is tearing a country apart, it has the racial issue. Then at the very least, at the very least, the government has to follow a philosophy such as the one in their own Assistant U.S. Attorney's Manual and the one in Planned Parenthood. You have to have a definitive statement, like in Romo, I'm going to put a bullet in the president's head, a firm, clear statement. Second, that the person speaking it or associates in a colluding environment are going to carry out that threat. And I believe that... No, you don't have to show he's going to carry out the threat. No, not that he's going to carry out, but either he or his associates have that intent. Okay? It should be unambiguous. Here, you don't have that, Your Honor. You have the first statement, he will have a .50 caliber in his head soon. Yes, my client owned a .50 caliber weapon. We would say that doesn't enlighten his intent because of the requirements of the First Amendment and the overlay of the First Amendment, because it is political speech. Okay. Justice Reinhart. Thank you. You're way over. Okay. Thank you. We'll hear from the government. Thank you. Good morning. Kyle Hoffman for the United States. Can we get to essentials in this case? Can you tell me what a threat there is when you tell somebody else to do something? How is that a threat when you urge other people to do something? Judge Reinhart, I'm not sure if you're asking a question because you think that that's all that these statements could be. No, I'm talking about they're separate counts. One count is shoot the NIG. Correct. The country is fucked, and what NIG has done anything right? Now, where is the threat that this individual makes when he urges other people to shoot the NIG? I'll answer it this way. I don't believe it's the case that the cases from this court require it be essentially a declaration, I intend to shoot Barack Obama. The statute says it's a crime to threaten, to kill, or inflict harm. Where in that statement is there a threat to kill or inflict harm? I would suggest, Judge Reinhart, that the statement itself, while it may be somewhat ambiguous. No, it's not ambiguous. It says shoot the NIG. Right. Where is the threat that I'm going to kill President Obama? Your Honor, I'd suggest that the reactions of the listeners indicate that, in fact, reasonable people interpreted the statement as being a threat to kill Obama. There were, by the court's count. Could be at least four people who saw that. Okay, so four people may have thought that. The constitutional standard is that the speaker must mean to communicate a serious expression of intent to commit an act of unlawful violence. Right. How does telling somebody else, urging somebody else to do it, show that the speaker intends to communicate his intent to commit an act? I suggest, Your Honor, that it's not simply those three words in isolation. Those three words coupled with racial motivation, those three words coupled with earlier statements, those three words coupled with possession of .50 caliber. Well, the people don't know that he's got .50 caliber things. They're communicating a serious expression of intent, according to Virginia v. Black. Correct. How do you communicate it when nobody knows you've got rifles in your house? Well, Your Honor, the elements are simply that there's an intent of an expression to do harm. Certain people, in this case, it's stipulated and it's shown from the documentary evidence, took it as a serious expression of an intent to do harm. Well, they don't interpret the Constitution. Understood. Okay. And that's our job, to apply a de novo test under the Constitution to what this means. Correct. And you think we should think that because four people called the FBI that said this guy's dangerous? I'm not relying on that alone, but I am relying on that as part of the mix. That's my suggestion. What exactly do we know about those four people and what they said? I mean, somebody can be dangerous in any number of ways. I mean, one way they could be dangerous is by saying, you know, I'm going to do this. Another way they could be dangerous is by calling on other people. A list man might very well think the guy's dangerous because he's out there encouraging people to take a pot shot at the candidates. Right. So what exactly do we know about the four callers? Okay. What we know about the four callers or responders, we know what's in the stipulated facts, which is they had different names on this. It's not actually a chat room. It's a message board. Was it two different message boards? No. There's some nomenclature problems in this case. As I understand it, it's one message board and there are different threads of messages. Right. Okay. I understand that. I have access to some of those, so I understand. And one thing I should point out is that the second message, shoot the nig, that message was in the header of the message. There's a very good reason that prompted immediate response and more response than the first comment, which was in the message body. I think that you need to step back. Aren't we required under Gordon and Cassell to look at the entire factual context in which the statements were made? This is a hot chat board with a number of threads going on, right? Threads, yes. Threats, I would say no. No, no, I know. I said threads. So this is obviously all through the night. Is it the night of the election? No, no. It's the night of October 21st. As I understand it, it's Eastern time, so it's roughly 1030 Pacific time that Mr. Bagusarian makes these comments. Okay. Right about that. So, okay, so you look at the context of all the other people talking and what he's responding to in the e-mails. That's true. That's not the only context you would look at, but you would look at that context. Yes. Because I think when Judge Reinhart was asking those questions, he was asking you to take these statements in isolation and say what is threatening about that. But I don't think I don't understand that to be the law. I'm not asking you to take it in isolation. I'm asking you to tell me how those words, urging other people to do something, could be a threat that he's going to do. Well, Your Honor, there is actually, I believe it's a Planned Parenthood case that says, oh, I'm sorry, it's the U.S. v. Lincoln case, I think it's referring to Planned Parenthood, that says it could be a threat if it's a signal to kill other, a signal to others to kill someone. So just because it's not necessarily a declaration of this. A signal is different from urging somebody to do it. A signal, sure, it says here, here's the flag, it's now time to go kill. Right. I understand. All I'm trying to suggest, Your Honor, is... I just don't understand how urging somebody else to do something, it may be a crime. I don't have any question about that. I'm just asking how it falls within the statute. All I'm suggesting, Judge Reinhart, is that the district court had to find the elements, kind of a belt and suspenders approach, all of the elements that it objectively was threatening, subjective intent, to meet all the statutory requirements, as well as the constitutional requirements, and it was a reasonable inference. I'm not saying that on its face, shoot the NIG, is unambiguously a threat. I'm not saying that on its face alone. What I am saying is that considered in context, as the district court did, it could be, and reasonably could be, considered a threat. Well, tell me then what other things turn a statement that on its face means you're urging somebody else to do something into a statement that you're going to do. I think we have a point of disagreement that, in the first place, that all it does is urge somebody else to do it. It isn't in the form of an imperative, shoot the NIG, but that could be, that's because I'm going to do it. I'm following a commandment that everybody should do. I'm disagreeing with Your Honor that it's only interpretable as urging someone else to do it, particularly when considered with the other context. You know, you never finished the answer to my question about the four other corners. I'm looking at the stipulation, and I don't see anything that's helpful to you, so maybe you can point to me where. Your Honor, the stipulation is pretty bare bones, and I'll just be as up front as possible with the court about this. The stipulation says, it gives the names of the chatroom participants, and it gives the name of John Gace, who was the person who called in the threat, on the second, the one that Judge Reinhardt has a problem with. Now, I've looked back at the discovery in the case. This is not in the stipulated facts. I'll just acknowledge that. John Gace told the Secret Service that he never, ever appeared on the chatroom. Just to understand the purpose of what you're telling me, if it's not in the stipulated facts, who cares? Why do I care? Well, okay, I won't go there. I'll just say there's... Maybe, yeah. I'm just wondering. I think... We can't rely on that stuff. The district court is not part of the record supporting the conviction, right? That's correct. So if it's there, and, you know, if we sort of look through the discovery and we find out a confession by the defendant saying, yes, I meant to kill, you know, it wouldn't help you a bit, right? No, I... Because it's not in the record. Right. So I'm happy to hear about it, but if you're just sort of inflaming me by, you know, you're not going to succeed. No, no, I'm not. I'm not easily inflamed. That wasn't what I was trying to do. All I'm suggesting... Well, what were you trying to do? I thought... I asked you, I guess when I asked you what is there, I meant what is there in the record that supports the conviction, you rely on these four people. Correct. Okay. And so I just want to know what's so specific, how that helps you. Well... When I look at the stipulation, there was no reference to the four people, there was reference to one person, and that reference is not helpful. I'm sorry, Your Honor, I neglected to mention there were also the exhibits, and the exhibits themselves show that there were four, there were three differently named people on the message board. It wasn't just the stipulated facts, this whole transcript that it was introduced as evidence, right? Correct. Was there other evidence as well? No. There were the stipulated facts, there were the exhibits, which include the message board, which show that these are different people. They're truncated. That is, the responses are truncated. They say things like, this is going, I'm going to report you to the Secret Service. I detailed them in our brief. People say all sorts of things they never do, and saying I'm going to report you to the Secret Service doesn't mean anything. In fact, if they say I'm going to report you to the Secret Service and don't, it sounds like they don't think it's that serious. Is there any evidence of any more than a single report to the authorities? Not on the record, no. So you've got one report. You've got some people willing to say things, but of course people say all sorts of things that they don't mean. The use of our verbally is not unusual in chat rooms, right? So is there anything in the record? I don't want to talk about this stuff that's not in the Office of Audit and Provision. That supports your statement that we can look at the four other callers as some sort of objective indication that this was perceived by those who heard this to be a threat on the Speaker's part, that he will harm the candidate. Well, Judge Kaczynski, I mean, all we have to go on is what is in the record, which is what they said on the message boards and what Mr. Base was stipulated to do. Walk me through it. Walk me through to what it is. Give me all the stuff that is there that helps your case. The first respondent, you've been reported by the – Where are you reading from? I'm reading from – this is the excerpt of the trial, trial exhibit two, supplemental excerpts of records, page two. Supplemental excerpts of records. This is – we have several volumes. This is the one that has – It's a very thin – It's the government submission. Okay, all right, I got it. So this is page two? Correct. Okay, so this is the little thing that has two at the lower right-hand corner of the page. Correct. Really sideways, right? Yes. Okay. And this was put in and it was – Oh, yes. No doubt about it. This is part of the record. Right. Okay, so what are you pointing to here? I'm pointing to the very first response below the message. Dan 757 says you've been reported by me, a good old white boy. I'm sorry. Oh, Dan 757 is somebody that says Arthur. That's Arthur. Correct. And Ray is Schudamig. I see. And underneath this is a message from Dan. Correct. You've been reported by me, a good old white boy. Correct. Reported to the school principal. It doesn't say anything. Reported to the moderator of the chat group. Reported to the business bureau. I think it's reported to the police. It doesn't say. We don't have the full – Well, what do you – I mean, you're the lawyer. You tell me what can be inferred from this. I can infer that someone took the statement seriously enough. If they didn't go on and carry through reporting it to someone, they responded and said, I think it's serious enough that at least I'm going to tell you I'm going to report this. But the statement that he's urging people to shoot Obama, is that not worth reporting? Well, I think it was worth reporting. Not because it's a threat that he would, but that he's urging people to do it. Well, I'm not sure I understand the import of your question, Your Honor. Well, I think you do. Wouldn't somebody feel that somebody who was urging people to shoot the president should be reported? Not because he's making a threat, but because he's urging people to do that. I'm not sure citizens think that urging people to shoot the president is something that – maybe they do think it's something that should be reported to the Secret Service. But it's also, it seems to me – That guy in New York is being prosecuted for saying something like that about three federal judges. It wouldn't be surprising if members of the public thought that putting a message urging people to shoot – I guess it wasn't the president at the time. It was a major candidate for public office, that people might say, whoa, this is like Bobby Kennedy, and this must probably be a crime, and we should report it. I think that's entirely possible. Are you referring to the Turner case, Your Honor? I'm not sure if I have – Yes. Yes. I mean, I realize that's sort of a case pending. We can't really talk much about it. It hasn't been a conviction or anything else. I mean, I'm saying that is a case where it was a statement – I mean, you're saying nobody would think that that's a crime to urge other people to shoot somebody, and yet that is a case where your Justice Department is prosecuting somebody for making a statement that clearly was, at least on its face, seemed to be urging other people to do something. I'm not familiar with what the particular statements were. I don't know that in secret. I only know what I read in the blogs, you know. Your Honor, I – And the message was – Which is not in the – The message was – Your Honor, just to try to more fully answer the Court's question about what do we know about the people, I detailed what they said and all that we know about what they said on page 7 of our brief, and it's just be advised federal law enforcement is monitoring. Be advised that this message board has been reported. I trust you left. If you didn't, I did report. That's what Dan says. Well, be advised that law enforcement is monitoring sort of sounds like, gee, I'm with you, so be careful, bro. When you say stuff like that, I want to make sure that you don't get into trouble for saying – It's about being the President. Your Honor, here's what – here's all I would suggest. I would suggest that what you have is a district court looking at the entire mix of these things, not isolating each element and saying, well, that could be this, no, that could be that. Looking at the entire mix, coming to the conclusion that the reasonable inference is all three elements have been met. What difference does it make what a district court did? We have a de novo review of the constitutional question. That's undeniably true. But I would suggest that the cases – I think it makes as much – what the district court does legally makes as much difference as what some guy thought who heard it. The question on what – is not what – whether the statement could be so interpreted, but what did he mean to communicate when he made the statement. That's the constitutional standard. And our standard constitutionally is, as we just agreed, what does it mean? Determine whether it's a true threat. Not – you know, it might be nice to know that a district judge thought it meant one thing, but it's not the same kind of weight you get in 95 percent of the cases we review. I agree that there's a de novo review for the quote-unquote constitutional facts, and that is, in this case, whether something's a true threat. That's very clear. It's also clear – and I'll just concede this – that there were stipulated facts in exhibits. So some of the reasons for deference, so to speak, are not around credibility. But I would also suggest – and this is directly from this case, this court's case in Stewart – that there are other reasons for at least some modicum of maybe stepping back and saying, well, the district court found this. Maybe there's – maybe a rational trier of fact could find these things, these ultimate facts, based on these facts, because we have to respect – and this is directly from Stewart – the fact that this fact finder drew reasonable inferences from proven facts. That's one element of – Okay. Why don't you summarize for me what you think are the reasonable inferences that this district judge could have drawn and must have drawn in order to support not only the conviction in terms of the statutory standard, but also to overcome the First Amendment objection? Well, one in particular is the issue of subjective intent. And there was some colloquy with Mr. Cortez about that. That's – as Your Honor pointed out, that's something that's typically left to a fact finder and is inferred from other kinds of circumstances. And in this case, the district court judge looked at – he's got a .50-caliber weapon. He's referring to a .50-caliber weapon. And later on, he's talking to people about, look what a .50-caliber weapon looks like. Well, you're switching from one count to another. You know, I don't – you know, I don't mind talking about the separate count. I mean, they're two different counts. I understand. We're now talking about the threat about shoot the nig. The other one about – we haven't even talked about yet, which is the other count, which says he's going to have a .50-caliber bullet in his head or something. That's a different issue with that. That's a question of whether that's a prediction of what's going to happen to him or whether that's a threat that he's going to do it. But that's a different issue. We've been talking up to now about the statement shoot the nig, which is one count. He's going to have a .50-caliber bullet in his head is a separate count. I understand. I understand that point, Your Honor. Well, I think what Jeff Kaczynski's question was, was what is there as to the count we've been talking about? Well, I'm not sure that any of this Court's cases require the district court to isolate the evidence that goes to the .50-caliber comment from consideration of the shoot the nig comment. I don't see that the court is required. Okay. You're saying that in relation to this count, then? I'm sorry? You're saying? It applies to both. I would suggest it applies to both. Okay. What was the reason that, I mean, after he heard from the other chat board thread as well that people were reporting it, after he hears all this and he gets also a lot of negative reaction to this comment suggesting that it's being understood as a threat, that he says, well, I was drunk. Isn't the district court entitled to draw an inference from that of kind of a consciousness of guilt that he was making and he intended to make a threat, not necessarily carry it out, but now he wanted to undermine that intent by making an excuse that he was drunk. That's one aspect that the district court could have inferred. Didn't she rely on that? I don't think explicitly, but I'd make another suggestion, and the expression is in vino veritas. Sometimes wine brings out what people intend more than when they're sober, and perhaps Mr. Bagasserian, his intent was revealed in the cuts, as it were. So that's another possibility. That's a kind of an inference that a fact finder could make. I'm not relying hugely on that, but it's something that a fact finder might consider. I think he was trying to— What would, again, back to my question, what could the fact finder infer, and what was necessary to infer to satisfy both the statutory and the constitutional standard? What was necessary to infer was that there was an expression of intent to kill or injure, that the person, Mr. Bagasserian, intended it to be understood in such a fashion. That's a subjective intent requirement, and that a reasonable person in his circumstances would foresee that others would interpret that, his statements, as serious expressions of intent to kill or injure. So three elements. That's the statute, and under the First Amendment, the thing here is that because of the Gordon case, because of the way the statute was interpreted, the government was required to, and all along said that we were required to meet all three of those elements. There's some controversy in this circuit about whether the subjective intent is always required in threat cases under the First Amendment or not. That controversy is not something we don't have to decide here. This Court doesn't have to decide because— The statute requires it. So then, going to the statute, the things like the .50 caliber weapon and the possession, the talk later on about acquiring .50 caliber, those are the kinds of inferences that would go to subjective intent. The reactions of the listeners, I'm suggesting that it's true we don't have a lot of information about the listeners and their backgrounds and so on, but it's an inference. Both of these statements have to be interpreted by the prior fact as a statement of personal intent. So when he says, shoot the leg, that—you would agree that the most natural way of reading that is as an imperative. I think as a matter of grammatical rules, it is an imperative. But if it's an imperative, that's not enough. If it's a command to others— Well, that's where I'm suggesting—a command to others. I mean, certain people think imperatives, such as those of the Ten Commandments or whatever, are commands to everybody. I mean, it could be a command to everybody, including Baggesserian himself. I'm suggesting that just because it's an imperative— No, no, no, that's perfectly fine. It could be a command, but you realize that this is not a command like in the Army— Correct. —where if you don't follow it, you get court-martialed or booted out for cowardice or something of that sort. It could be a command to others and a command to yourself, and yet reveal no present intent to follow the command. So command doesn't get you far enough. It has to contain something more than an imperative. It has to be interpreted as a statement of intention to follow the command. And it could be rather—it could be an elliptical statement that says, I plan to shoot the next one. Right, and that's possible. I agree that that's possible. It's three words, and we're cutting them out and isolating them. I understand. So as an imperative, I don't think that will get you far enough. At some point, you have to read into the statement some other perhaps elliptical expression of intent to carry out, like I will carry out, or in the other one where it says he will find a bullet in his head, the most natural way of reading it is a prediction of the future, but you could perhaps say he will find a bullet in his head because I plan to put it there. I mean, one way to interpret it is I predict that's going to be the future because that's what I intend to do. I can see the future because that's my plan. Now, it's open to interpretation, I agree, but I'm just suggesting that the cases are such that it's Planned Parenthood, it's Hannah. They don't have to literally be threats. Well, let's subtract or take the First Amendment issue off the table for the time being, and just look at the normal Jackson, Mississippi, Virginia substantial evidence. Is the fact that a statement which on its face, if you just look at the words that appear in it, let's say the second statement, he will have a bullet in his head. The fact that he could get it, and I'm predicting that he will have a bullet in his head because I plan to put it there. Is the mere possibility that that's what it signifies enough to sustain the government's burden on a criminal case? Well, I would suggest that it's just an ordinary Rule 29 motion, yes. And why is that? Because it's whether any rational trier of fact could find from the facts and evidence. It just restates the question. Well, why would a rational trier of fact fill in those words rather than the words, well, I sure as heck don't plan to do it, but I hope there's somebody with enough courage, let's say, or enough gumption to put a bullet, you know, so I expect there is somebody out there with that kind of courage. You know, I mean, why fill in those words as opposed to many other words? Right. I would suggest it's because the cases are never decided just on the statements alone. Certainly in the Rule 29 motion, they're decided on all a mix of facts and circumstances. I want to make sure that we make that, those extra words, the words, I am, because I am planning, there will be a bullet in his head because I am the one who put it there. Well. Whether you made that the more likely influence. First of all, the position of the .50 caliber weapon, the talk about getting other .50 caliber weapons, the talk with other, the exchange of e-mails about what a .50 caliber weapon will do to the President's car and so on. I mean, when he's talking about .50 caliber weapons and there's other things there, he's talking about the Desert Commando or something like that, the real .50 caliber. Yes, which is available to the public. I mean, it's. I've handled it myself. It's. Quite a piece of ordinance, but that's not what he actually had in his closet. No, that's correct. But he was, there were e-mails obtained later which said we need, so-and-so needs to get one of these, and this is what it does, will do to a presidential car. So which way does the, how does the factor, how does the fact that these statements were occurring anonymously on an Internet chat room factor into the analysis? I would suggest it actually makes them more ominous. I'd analogize it to the fact that you don't really know who it is that's speaking. You don't have any kind of context about whether the person might be joking or not, and. Well, in fact, nobody understood it as a joke. Well. No one said ha-ha. Well, that's a good point. There weren't any, I didn't see any smiley emoticons, either after Mr. Bagusarian's statement or in the others. And so I guess the point I'm trying to make is that the anonymity or the semi-anonymity, because people can always be tracked down. It's kind of hard to do unless you know the group from elsewhere to track down who they are. It's a very flat kind of statement. And so, I mean, if you think. I agree with what was coming out of schools and what was said there. Let me quote it for you just so you have a fresh view. He said, Many times people say things anonymously on the Internet that they would never say in another conference and have no intention of carrying out. He said that. Are you familiar with the case? Actually, I had seen the case before the briefing, and I know the title. I haven't recognized the comment that the court has made. Is that the panel opinion you're reading from? There is only a panel opinion. Okay. Is that the one you? Okay. That's the panel. It's not final. And so, you know, there's a bank petition. So just like in those other cases, it might change. But I'm just saying as the law now stands in our circuit, that is a statement from an opinion of a three-judge panel. Judge Kuczynski, here's what I suggest. I think that is true. People will say things when they think they're anonymous that they might not intend to carry out. But carrying out is not an element of this offense. The question is whether a reasonable person would foresee that others would interpret it as a threat. And that's where the anonymity. Well, that's not really the question either. I mean, Judge Kuczynski just asked you about the statutory question. But under the constitutional question, did he mean to communicate a serious expression of intent to commit an act? Now, for that, what he communicated to people doesn't depend on whether he's got things in his garage or not or anywhere else. It's the threat itself, the people here. Did he intend by that threat to communicate to other people that he intended to commit an act, whether he really did or not? Did he intend to communicate? Right. Part of this whole constitutional question is you don't want to put the candidate in fear or the president in fear. You don't want to disrupt their things. So whether he intended to carry it out doesn't matter. Correct. I agree. All right. So it doesn't matter what he had in his garage. The people that he the language that he communicated to people didn't say, and by the way, I've got guns in my garage. Right. That's where I believe it's and it's been held in cases in this court. So whatever they held in the court, if it's since Virginia v. Black, there's I've read some of our cases that say, well, we don't know what the rule is. There are several cases that say different things, but we don't have to decide. But we can follow the Supreme Court. That should be good enough for us. You know, if I could just the question about the relevance of the firearms possession and the talk about the firearms, that has been explicitly held to be relevant evidence going to subjective intent, which is one of the elements here and one of the First Amendment elements, so to speak. And that's the Sutcliffe case. Which case? Sutcliffe. Oh, we've cited that in the brief. Now, I'm not saying a fact finder would have to have to. The panel has been very patient with me. If I have any, if the panel has further questions that I can try to answer, I'll happily do so. No, I was just apologizing to Judge Kuczynski for turning my back to him. I'm just trying to warm up with this floor heater I have. I'm so cold. I think I worry too much about people in the audience falling asleep, so I keep it cold. I know the lawyers counsel people aren't going to fall asleep because we turn up the fire under them, so we take care of that part. Thank you very much. Okay, thank you. Mr. Cortez, you may have a minute for rebuttal. Very briefly, Justice Worla, you make a point that the statement afterwards by Mr. Bagdasarian, look, white boy, I was drunk, could be evidence of consciousness of guilt. There's a jury instruction that applies to this case, and those instructions would also apply to a bench trial. And when you have a statement that is subject to two interpretations, you favor that that does not harm the defendant. Here, when he said, I was drunk, he could have easily meant, I have no clue what I was saying at the time. That's not consciousness of guilt. So that is as equally logically probable as that, yes, I meant that as a threat, but I was drunk. Those two are equally probable, we submit, and under the rule of lenity, you have to give them the benefit of the doubt. And one last thing that I'll say is this. The real danger here as we engage in these abstractions, because there are abstractions here, is the choice of prosecution. The government has the power to select someone from our society for prosecution. We have spent the better part of about 40 minutes here disagreeing in some parts, agreeing in others, about the meaning of certain words, whether it's an imperative, whether it's vague, or whether it's precise. That is the danger here, and let me very quickly quote from the government's brief, and I'll stop at that. At page 12, the government says, The basic idea that statutes criminalizing threats against the president or presidential candidates address harms of a sufficiently compelling nature to survive strict scrutiny. And here's the key. regardless of whether the defendant subjectively intended his statements to be taken as a threat or not. Then at the bottom of that, the government says, Even if the defendant does not mean them to be taken as threats. What does that mean? That means they want to apply the objectively rational test to 879.83. You can't do that. They want you to read the basic requirements of 879.83. It's a different statute. It's not like the Planned Parenthood statute. It's not like the statute that applies to the president. It's more lenient because in a candidacy, people will say things that maybe they don't mean to be threats. It's an expression of a political thought, and that's the danger. Thank you. Thank you. Mr. Perfetti's case, sorry, you will stand for a minute. We'll next hear an argument in the United States versus Sandoval Gonzalez.
judges: Kozinski, Reinhardt, Wardlaw